**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

INSIDER ASSET MANAGEMENT, LLC, Individually and on Behalf of All Others Similarly
Situated,

      Plaintiff,

v.

BOULDER BRANDS, INC.,
STEPHEN B. HUGHES,
JAMES B. LEIGHTON, and
CHRISTINE SACCO,

      Defendants.

---

**CLASS ACTION COMPLAINT and JURY TRIAL DEMAND**

---

Plaintiff Insider Asset Management, LLC ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by BOULDER BRANDS, INC. ("Boulder" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Boulder; and (c) review of other publicly available information concerning Boulder.

**NATURE OF THE ACTION AND OVERVIEW**

1. This is a class action on behalf of purchasers of Boulder securities between December 23, 2013 and October 22, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Boulder is a natural consumer packaged food company. The Company's health and wellness platform consists of brands that target specific health trends: the Glutino and Udi's Gluten Free brands for gluten free diets; the Earth Balance brand for plant-based diets; the Level Life brand for diabetic diets; EVOL branded foods for consumers seeking convenient foods made with pure and simple ingredients; and the Smart Balance brand for heart healthier diets. The Company distributes its products in all major retail channels, including natural, grocery, club and mass merchandise, and the foodservice and industrial channels.

3. On October 22, 2014, the Company announced that the Company was experiencing issues with boosting its gross margins due to brand acquisition and integration issues, a shift in product mix, and internal operational issues. Additionally, the Company

announced that it would likely take a $147.5 million impairment charge related to the Smart Balance business decline.

4.       On this news, shares of Boulder declined $3.11 per share, over 24%, to close on October 22, 2014, at $9.62 per share, on unusually heavy volume.  Shares of Boulder further declined $0.63 per share, approximately 6.5%, to close on October 23, 2014, at $8.99 per share, reflecting a two-day decline of 29% on unusually heavy volume.

5.       Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was experiencing integration issues related to the acquisition of EVOL and Udi brands; (2) that the Company's Smart Balance product segment was under-performing; (3) that, as a result of this and other issues, the Company's gross margins would be lower than expected; and (4) that, as a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

6.       As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.       The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Boulder's principal executive offices are located within this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Insider Asset Management, LLC, as set forth in the accompanying certification, incorporated by reference herein, purchased Boulder common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Boulder is a Delaware corporation with its principal executive offices located at 1600 Pearl Street, Suite 300, Boulder, Colorado 80302.

13.     Defendant Stephen B. Hughes ("Hughes") was, at all relevant times, CEO and a director of Boulder.

14.     Defendant James B. Leighton ("Leighton") was, at all relevant times, Chief Financial Officer ("CFO") and a director of Boulder.

15.     Defendant Christine Sacco ("Sacco") was, at all relevant times, Chief Financial Officer ("CFO") of Boulder.

16.     Defendants Hughes, Leighton, and Sacco are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Boulder's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Boulder is a natural consumer packaged food company.  The Company's health and wellness platform consists of brands that target specific health trends: the Glutino and Udi's Gluten Free brands for gluten free diets; the Earth Balance brand for plant-based diets; the Level Life brand for diabetic diets; EVOL branded foods for consumers seeking convenient foods made with pure and simple ingredients; and the Smart Balance brand for heart healthier diets.

The Company distributes its products in all major retail channels, including natural, grocery, club and mass merchandise, and the foodservice and industrial channels.

**Materially False and Misleading**
**Statements Issued During the Class Period**

18.     The Class Period begins on December 23, 2013.  On this day, Boulder issued a press release entitled, "Boulder Brands, Inc. Announces Acquisition of EVOL Foods."  Therein, the Company, in relevant part, stated:

**A Leading Brand in Natural Frozen**
**Transaction Will Further Diversify Health and Wellness Food Platform**

Boulder Brands, Inc. (NasdaqGM: BDBD) today announced it acquired 100% of the equity interests of Phil's Fresh Foods, LLC, owner of EVOL Foods ("EVOL"), for $48 million,  before future tax benefits.  Boulder Brands is buying EVOL from founder Phil Anson and a group of investors including Alliance Consumer Growth and an investment vehicle created by Revelry Brands and Spier Capital Management.

Based in Boulder, CO, EVOL manufactures and markets premium frozen convenience foods with a focus on pure and simple ingredients.  Current products include burritos, quesadillas, entrees, bowls, and skillet meals.   The Company's philosophy on food is simple - 'Love what you eat.'  EVOL offers great-tasting foods made with pure and simple ingredients, including those that are antibiotic- and hormone-free, and are free of artificial preservatives or flavors and made with organic ingredients.   In the twelve month period ending December 31, 2013, EVOL net sales are estimated to grow 70% to $17.0 million.

**Transaction Highlights:**

- Boulder Brands paid $48 million in cash.  This is before future cash tax benefits, the net present value of which is estimated to be $8.0 million, for a net cash price of approximately $40 million.
- The acquisition was financed through a combination of the Company's recently expanded senior secured term loan credit facility, its revolver and cash on hand.
- At close, debt is estimated to be approximately $300 million and the Company's leverage ratio is estimated to be 3.9x.
- For 2014, the Company expects EVOL to contribute approximately $25 million in net sales and, given EVOL is in its early stages of growth, EVOL is expected to generate $1.5 million in estimated EBITDA.  On a

GAAP basis, EVOL is expected to be dilutive to earnings per share by approximately $0.02 per share in 2014.

- ***As a result, the Company expects 2014 sales to be in the range of $540 million to $550 million (previous range of $515 million to $525 million); adjusted EBITDA to be in the range of $89 million to $94 million (previous range of $87 million to $92 million) and earnings per share to be in the range of $0.41 to $0.46 (previous range of $0.43 to $0.48).***
- For 2015, the Company expects EVOL to be accretive to earnings per share.

As first mentioned above, on December 20, 2013, Boulder Brands increased its senior secured term loan credit facility, at the same interest rate as the original loan, by $25 million to $275 million. In addition, the Company amended the financial covenants on its revolving credit facility to increase the senior secured funded debt-to-EBITDA covenant by 0.25x for each quarterly period.

Commenting on the announcement, Chairman and Chief Executive Officer Stephen Hughes stated, "While this acquisition is relatively small in size, we believe it to have significant potential for Boulder Brands, as EVOL is a category-elastic brand in an exciting segment that will further accelerate our growth rate and diversify our mix to high-growth natural brands. Consumers are demanding pure and simple ingredients in the food they buy, and retailers are in the process of renovating their freezers with healthier alternatives. With EVOL, Boulder Brands will participate in this exciting growth opportunity with a newly defined 'pure and simple' food platform."

Furthermore, Mr. Hughes stated, "We see considerable revenue and platform synergies with EVOL and Udi's. EVOL has built a strong brand proven in the natural channel and a clear proof of concept in conventional retail, resulting in considerable white-space opportunity in conventional, mass and club channels. In addition, its portfolio of products is the perfect complement to Udi's wide range of gluten-free frozen baked goods. The EVOL team, led by Phil Anson, brings expertise we believe essential to building out both our EVOL and Udi's frozen platforms. This portfolio, which will include EVOL and Udi's® Gluten Free frozen pizzas, burritos and entrees, will enable us to offer all retailers in North America a strategic partner to help renovate their freezer cases."

"We are very impressed with the EVOL Foods management team. Both companies have similar missions and values of making healthier food that tastes delicious; and done with transparency and accountability. Through this combination, we believe Boulder Brands' core competencies in sales, marketing and product development will help EVOL realize its growth potential, ultimately creating long-term value for our shareholders, and exciting opportunities for our new and existing employees," concluded Mr. Hughes.

"I know I speak for the entire EVOL team when I say we are enthusiastic about joining the Boulder Brands organization and keeping the company in our hometown of Boulder," stated Phil Anson, Co-Founder and Chief Operating Officer. "This exciting change of control will offer us the ability to further our mission and catapult growth of the EVOL Brand as we continue to re-define frozen convenience food and lead a sea change in natural and organic frozen category growth. Both Steve and I are aligned in our vision and look forward to working together to establish and grow the pure and simple health and wellness platform."

**Inducement Grants**
The Company granted option awards for a total of 660,000 shares of common stock to 24 of EVOL's employees as an inducement to join the Company in connection with the acquisition. The awards were granted under the Company 2012 Inducement Award Plan, as amended. The options have a ten year term and an exercise price equal to the fair market value of Company common stock on the date of grant. The options vest in four equal annual installments beginning on December 23, 2014, the first anniversary of the grant date.

Boulder Brands was advised by Fried, Frank, Harris, Shriver & Jacobson LLP. The sellers were advised by Houlihan Lokey and Robinson & Cole LLP.

(Emphasis added).

19.     On February 27, 2014, Boulder issued a press release entitled, "Boulder Brands Announces 2013 Fourth Quarter Results." Therein, the Company, in relevant part, stated:

Boulder Brands, Inc. (NasdaqGM: "BDBD") today announced its financial results for the fourth quarter ended December 31, 2013. For the fourth quarter of 2013 compared to the equivalent period of 2012:

- Net sales increased 11.0% to $125.5 million, operating income increased 16.9% to $13.1 million, non-GAAP operating income increased 38.8% to $16.1 million and adjusted EBITDA increased 25.5% to $22.7 million.

- Organic net sales, which exclude the impact of licensing milk and discontinued items from our net sales in the fourth quarter of 2012, increased 15.8%. Organic consumption growth, which is growth in scanned sales at retail and excludes the impact of licensing milk and discontinued items, was 18.6%.

- Diluted earnings per share were $0.08 in the fourth quarter of 2013, compared to $0.06 per share in the fourth quarter of 2012.

- Excluding certain items, non-GAAP diluted earnings per share were $0.11 in the fourth quarter of 2013, compared to $0.06 in the fourth quarter of 2012.

The Company also reiterated its 2014 outlook and provided further detail for its earnings per share outlook. For 2014, the Company continues to expect net sales to be in the range of $540 million to $550 million, EBITDA to be in the range of $80 to $85 million, and adjusted EBITDA to be in the range of $89 million to $94 million. In addition, the Company updated its earnings per share outlook to be in the range of $0.39 to $0.44, compared to the Company's initial estimate of $0.41-$0.46, to reflect updated estimates for stock-based compensation and depreciation and amortization.

Commenting on the results, Chairman and Chief Executive Officer Stephen Hughes stated, "We ended the year on a strong note, as we continued to see strong sales momentum in our Natural segment and improved profitability in our Smart Balance segment. Our Natural segment, which includes the Udi's, Glutino, and Earth Balance brands, represented 65% of our total net sales and reported a strong net sales increase of 34.4%. The Natural segment continued to benefit from distribution gains with our gluten-free brands and Earth Balance spreads, nut butters and snacks."

Commenting further, Mr. Hughes said, "Our Smart Balance segment continued to execute on its core strategies which resulted in an increase in brand profit for this segment. While organic net sales for the Smart Balance segment declined 8%, brand profit increased 24%. Despite the difficult environment for spreads, we capped the year with a more stable Smart Balance as we completed our initiative to exit certain categories that are not strategic and implemented a licensing agreement for Smart Balance Milk with Byrne Dairy. In addition, we concluded the transition to space saver packaging and gained points of distribution on spreads."

Finally, Mr. Hughes stated, "At the end of the fourth quarter, we acquired EVOL Foods. Based in Boulder, CO, EVOL is a relatively small company but has significant growth potential as part of the Boulder Brands portfolio. EVOL is a platform growth brand, with consumer permission to expand and span multiple day parts, eating occasions and categories. This platform brand will allow us to further accelerate our growth rate and continue to diversify our business mix to high growth, natural brands. With EVOL, Boulder Brands will participate in this exciting growth opportunity with a newly defined 'pure and simple' food platform. Consumers are demanding pure and simple ingredients in the food they buy, with ingredient names they can pronounce. Retailers are currently in the process of renovating and rejuvenating their freezer cases with healthier alternatives. Combined with our Udi's pizza platform, we will now offer consumers and retailers two highly disruptive solutions to a tired category. In the fourth quarter, had we owned EVOL for the full quarter, organic consumption

growth excluding discontinued products would have been 20.5% compared to the 18.2% we reported."

## 2013 Fourth Quarter Results

Total Company net sales in the fourth quarter of 2013 increased 11.0% to $125.5 million, compared to net sales of $113.0 million in the fourth quarter of 2012. This performance reflected strong growth from our Natural segment.   Organic net sales, which exclude discontinued items and the licensing of Smart Balance Milk from our reported net sales in the fourth quarter of 2012, increased 15.8% in the fourth quarter of 2013 compared to the fourth quarter of 2012.

\*       \*       \*

## Segments

As previously announced, with its recent acquisitions, the Company has evolved its Natural and Smart Balance segments to Natural and Balance, which aligns with the way the Company has begun to operate its business in the first quarter of 2014.    In the appendix of this press release, the Company provides revised quarterly segment results for the most recent eight quarters.   The two defined segments are as follows:

The "Natural" segment consists of Udi's, Glutino and EVOL branded products. The "Balance" segment   consists of Smart Balance, Earth Balance and Level Life branded products.   The brands represented in the Balance segment all represent balanced nutrition, and moving Earth Balance and Smart Balance to the same segment will help leverage the synergies between these brands given they share the same core product platform with spreads and nut butters.

## 2014 Outlook

For 2014, the Company continues to expect net sales to be in the range of $540 million to $550 million, EBITDA to be in the range of $80 to $85 million, and adjusted EBITDA to be in the range of $89 million to $94 million.  In addition, the Company updated its earnings per share outlook to be in the range of $0.39 to $0.44, compared to the initial estimate of $0.41-$0.46, to reflect updated estimates for stock-based compensation and depreciation and amortization.

The Company provided the following updates regarding its outlook for 2014:

- The Company expects overall net sales growth in 2014 to be in in the 15% to 20% percentage range versus 2013 and organic net sales growth to be in the 13% to 18% range. The organic growth calculation excludes sales from milk during the first half of 2013 and includes the sales from EVOL Foods for the full year of 2013.   The Company expects growth to be

9

driven by increased distribution and continued velocity for Earth Balance, Udi's and Glutino and the inclusion of EVOL on a full year basis.

- Total net sales growth for the Natural segment is estimated to be 35% to 40%. Organic net sales growth in the Natural segment, which assumes the Company owned EVOL in both periods, is estimated to be 25% to 30%.

- Total net sales for the Balance segment is expected to be in the range of a low-single-digit decline to a low-single-digit increase. Organic net sales for the Balance segment, excluding milk sales in 2013 given the move to license milk, is expected to increase in the low-single-digit range.

- Gross profit margin for the year is expected to be in the 37% to 42% range as strong growth in the Natural segment will impact overall gross margin. In addition, the Company believes the impact from higher commodity prices and lower utilization will impact the gross margin more significantly in the earlier quarters and improve sequentially throughout 2014.

- Stock-based compensation expense is expected to be approximately $9 million.

- Capital expenditures in 2014 are expected to be approximately $20 million. The capital expenditures primarily relate to the Company's efforts to further automate the production of gluten-free products and the automation and expansion of frozen food capacity.

- Total depreciation and amortization is expected to be approximately $24 million.

- Interest expense is estimated to be $17 million, reflecting a full year of increased debt levels, as a result of the borrowing incurred for the acquisition of EVOL Foods.

- The Company's tax rate is expected to be approximately 40% in 2014.

20.     On February 27, 2014, Boulder filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year. The Company's Form 10-K was signed by Defendants Hughes, Leighton, and Sacco, and reaffirmed the Company's statements previously announced that day.

21.    Also on February 27, 2014, the Defendants hosted a conference call with investors and analysts discussing the Company's earnings results.  During the call, Defendant Sacco, in relevant part, stated:

> Gross profit margin for the year is expected to be in the 37% to 42% range as strong growth in the Natural segment will impact overall gross margin. In addition, we are being impacted by higher commodity prices for egg whites, a key ingredient for our bread business as the price has spiked from an average of $5 per pound to over $8 per pound in a short time. Throughout 2014, we expect to see a sequential improvement in gross margins as operational improvements and a price increase for Udi's should somewhat offset higher egg white prices throughout the year.
>
> As a result, we expect gross margin to be at the lower end of the range in the first half of 2014 and at the higher end in the second half of 2014.

22.    With respect to the Company's 2014 strategy, Defendant Hughes, in relevant part, stated during the call:

> I mentioned in Q4, we initiated a comprehensive strategic review to ensure we have the integrated strategies, processes and operations in place to keep up with our growth and then take steps to ensure we have the people and infrastructure to keep pace. Jim Leighton, our COO, is leading this initiative, and I'm very encouraged by the progress on this project and the potential benefits as we move through 2014 and into 2015. Jim has identified specific platforms and has hired an expert outside consulting firm to help us develop our long-term manufacturing plan with the goal of ensuring the most optimal and low-cost production of our brands, products and platforms.

23.    During the question and answer portion of the call, the following exchange occurred between analyst Jon Andersen ("Andersen") of William Blair & Company L.L.C and Defendants Hughes, Leighton, and Sacco, in relevant part:

> <u>Andersen</u>: Last question is just on gross margin and the guidance. So it's clear with, I guess, input costs and you called out dried egg white prices and maybe just the ramp in the Denver facility that gross margin should improve sequentially throughout the year. Can you talk about your kind of visibility right now, particularly on the input cost side? How confident you are, where you've bought forward or have good visibility that gives you confidence that we can see that kind of sequential steady improvement as we move through the year?

<u>Defendant Hughes</u>: Yeah. There're really three things. The real big impact in the fourth quarter and to some extent in the first quarter is going to be the launch expenses in the UK. That's a strategic decision and investment, but that's probably half of the...

*       *       *

<u>Defendant Hughes</u>: Year-over-year difference. The second thing is we are taking a price increase that will be effective March 1, which will cover some of the issue on egg whites. But most importantly, and maybe I'll let Jim talk to this, we have a lot of low hanging fruit on margin improvement, and that work is really underway in a major way. So maybe, Jim, do you want to touch on that?

<u>Defendant Leighton</u>: Yes. Good morning. Yes. We really have a four-phased approach. The first one is in the second half of last year we had to get our arms quickly around customer service, so we built up the capabilities and capacities to support that. And I'm happy to tell you now that we have customer service levels where they need to be. The other is relative to noncapital related items that we're working on in all of our facilities and that's continuous improvement. So we're bringing some new tools and so forth to the table to work on that. And then, the third is, we are working on our co-packed and internal network and optimizing what that looks like. So the $20 million that Steve referenced earlier, he referenced that we're going to make sure that we're investing in those sustainable proven product platforms, which will significantly reduce cost of goods manufactured, it will increase quality and it'll also help us on the service side of our business.

<u>Defendant Sacco</u>: And, Jon, I would just echo. I think we have very clear visibility to how we offset the egg white costs. In the guidance for 2014, we've assumed – we are not hedging egg whites. That market is not available to us. But we've assumed kind of current prices continuing to hold for the entire year. But we're already seeing in Q4 improvements in the Denver facility in terms of efficiencies. Obviously, overhead absorption continues to come down as the volume increases. We're seeing increases in yield. We're seeing that even in Q1 versus Q4. And so, I think we feel very confident in our ability to offset the impact of the egg whites.

<u>Defendant Hughes</u>: I think the other thing too is Kerin Kennedy, who is our new Chief Innovation Officer is really taking a fresh look at all formulations on how do we improve products, first and foremost, but also how we maybe optimize those formulas. When you think about this gluten-free model, I mean it's only been five years since we've actually been able to make a bread people will eat. But that's generation one and I think that there's an ongoing opportunity. We're going to be launching a new and improved Glutino bread in the first quarter and the product is just a step-change, step-function-change better in both product quality and cost than last. So I think what you'll see over the next four quarters,

eight quarters is just continually for us to dial this in with the scale. The nice thing we have, we have the scale. We've got volume now to really be able to leverage whether it's automation or it's leveraging strategic sourcing of ingredients and such. So, again, I think we feel pretty that we're going to see real strong sequential
improvement as we move quarter-to-quarter this year.

24.     On May 8, 2014, Boulder issued a press release entitled, "Updated - Boulder

Brands Announces 2014 First Quarter Results."  Therein, the Company, in relevant part, stated:

Boulder Brands, Inc. (NasdaqGM: "BDBD") today announced its financial results for the first quarter ended March 31, 2014.  For the first quarter of 2014 compared to the equivalent period of 2013:

- Net sales increased 15.2% to $122.9 million, operating income decreased 58% to $5.3 million, non-GAAP operating income decreased 20.9% to $10.2 million and adjusted EBITDA decreased 3.2% to $17.7 million.
- Organic net sales increased 17.6% and organic consumption growth increased 15.5%.
- Diluted earnings per share were $0.01 in the first quarter of 2014 compared to $0.06 per share in the first quarter of 2013.
- Excluding certain items, non-GAAP diluted earnings per share were $0.05 in the first quarter of 2014, compared to $0.07 in the first quarter of 2013.

The Company also reaffirmed its guidance, but narrowed the range on profit metrics due to the impact and uncertainty of egg white prices. For 2014, the Company continues to expect net sales to be in the range of $540 million to $550 million. However the Company updated its adjusted EBITDA outlook to be in the range of $89 to $91 million, from $89 million to $94 million previously, and its earnings per share outlook to be in the range of $0.39 to $0.41, at the lower end of its previously stated $0.39 to $0.44 range, primarily reflecting updated estimates for higher egg white prices for the remainder of 2014.

Commenting on the results, Chairman and Chief Executive Officer Stephen Hughes stated, "While we continued to see strong sales momentum, our bottom line results were muted due to higher than expected egg white prices, which are an important ingredient in our gluten free bread business, as well as the mix shift to our Natural segment, which has lower gross margins. Regarding the higher egg white price environment, we expect to somewhat offset the impact as we are in the process of improving our formulation, which requires less egg white.  In addition, we have a number of margin improvement projects in process.  As a result, we expect to see gross margins return to more normal levels in the back half."

Commenting further, Mr. Hughes said, "The Natural segment, which includes Udi's, Glutino, and EVOL, represented 60% of our total net sales and reported a strong organic net sales increase of 39.5%. The segment continued to benefit from distribution gains across the brands. We had top to top meetings with 10 of our top 20 accounts during the quarter and expect significant distribution gains across our natural portfolio in the second half.  In addition, our Balance segment continued to execute on its core strategies during the quarter.  While organic net sales for the Balance segment declined 4.7%, brand profit continued to increase. Despite the difficult environment for spreads, we continue to lead the category in innovation with the transition to non-GMO, once again giving Smart Balance a significant point of differentiation in the category. Non-GMO Smart Balance is hitting the shelves now and will be fully converted by the end of the second quarter."

"Overall, despite some short-term gross margin pressure, we are pleased with the first quarter.  I believe the stage is set for us to build on both revenue and margin. As we move from the first half of the year to the second half, we expect to  begin to see the fruits of our efforts in terms of our margin improvement program and major distribution gains on our major sales initiatives - Project Gluten Freedom, Frozen Forward with Udi's and EVOL, and expansion into the Club channel," concluded Mr. Hughes.

**2014 First Quarter Results**

Total Company net sales in the first quarter of 2014 increased 15.2% to $122.9 million, compared to net sales of $106.7 million in the first quarter of 2013.  This performance reflected strong growth from our Natural segment.  Organic net sales, which include EVOL sales and exclude discontinued items and the licensing of Smart Balance Milk from our reported net sales in the first quarter of 2013, increased 17.6% in the first quarter of 2014 compared to the first quarter of 2013.

*       *       *

**2014 Outlook**

For 2014, the Company continues to expect net sales to be in the range of $540 million to $550 million; however, it has updated its adjusted EBITDA outlook to be in the range of $89 to $91 million, from $89 to $94 million previously. Additionally, the Company updated its earnings per share outlook to be in the range of $0.39 to $0.41, at the lower end of its previously stated $0.39 to $0.44 range, primarily reflecting updated estimates for higher egg white prices, and based on diluted shares outstanding of 63.6 million.

The Company provided the following additional information regarding its outlook for 2014:

14

- For the second quarter, the Company expects gross margin to be approximately 37% and net income to be similar to Q1.
- In the second half of the year, the Company expects to see a sequential improvement in gross margin due to operational improvements. Accordingly, in the second half of the year, we expect to see a sequential improvement in gross margin to 41% by the fourth quarter. Despite higher egg white prices, gross margin is expected to benefit from trade efficiencies, cost of goods reductions by improving its formula, and efficiency gains with its co-packers. Additionally, we expect margin improvement in the UK and at Level as they lap start-up costs associated with product launches.
- For the year, stock-based compensation is expected to be $10 million.

25.     On May 8, 2014, Boulder filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Hughes and Sacco, and reaffirmed the Company's statements previously announced that day.

26.     Also on May 8, 2014, the Defendants hosted a conference call with investors and analysts discussing the Company's earnings results. During the call, Defendant Sacco, in relevant part, stated:

> For the second quarter, given higher-than-expected egg white prices, we expect gross margin to be approximately 37% and net income similar to Q1. In the second half of the year, we expect to see a sequential improvement in gross margin as operational improvements are expected to improve margin to 41% by the fourth quarter.

> Despite higher egg white prices, we expect gross margin to benefit from a number of initiatives. The first is an improvement in our cost of goods, as we are in the process of improving our formulation, which requires less egg white. This new formulation is in production and when inventories flow through, it will have a meaningful impact in Q3. In addition, we have launched a major margin improvement program and the scale of our emerging brands, Udi's, Glutino and EVOL provides us with a wide range of margin improvement opportunities.

> Second, we have the price increase that was effective as of March 1 on our Udi's bakery items. Next is trade efficiencies. This has been an area of opportunity for us for sometime as we focus on improving trade and promotions for both the Natural and Balance segments. And we expect margin improvements from the UK business as we lap the start-up costs associated with product launches and move all ambient product production to the UK.

27.     During the call, Defendant Hughes, in relevant part, stated:

Finally, we expect to make investments to support the overall growth of ensuring greater operational capacity and efficiency across the organization, ultimately improving gross margins. In the near term, as we move from the first half to the second half, we'll begin to see the impact of our efforts. Our comprehensive margin improvement program should deliver meaningful improvement from 37% in the first quarter to the low 40%s by year end.

28.     On August 7, 2014, Boulder issued a press release entitled, "Boulder Brands Announces 2014 Second Quarter Results."  Therein, the Company, in relevant part, stated:

Boulder Brands, Inc. (NasdaqGM: "BDBD") today announced its financial results for the second quarter ending June 30, 2014. For the second quarter of 2014 compared to the equivalent period of 2013:

- Net sales increased 18.7% to $131.3 million, operating income decreased 19.9% to $8.6 million, non-GAAP operating income decreased 20.3% to $9.4 million, and adjusted EBITDA was flat year over year at $17.6 million.
- Organic net sales increased 19.4% and organic consumption growth increased 17.2%.
- Excluding certain items, non-GAAP diluted earnings per share were $0.05 in the second quarter of 2014, compared to $0.06 in the second quarter of 2013.
- The Company reaffirmed its previously stated 2014 guidance. The Company continues to expect net sales to be in the range of $540 to $550 million, adjusted EBITDA to be in the range of $89 to $91 million, and its earnings per share to be in the range of $0.39 to $0.41.

Chairman and Chief Executive Officer Stephen Hughes stated, "We executed our plan in the quarter and we are on track to reach our full year targets. While first half profits continue to be muted due to elevated egg-white prices and the mix shift to Natural, we are experiencing strong sales momentum and anticipate significant margin improvement and further distribution gains from our core initiatives in the second half. Importantly, we now have egg-whites locked in for the duration of the year."

Commenting further, Mr. Hughes said, "The Natural segment, which includes Udi's, Glutino, and EVOL, represented 61% of our total net sales and reported a strong organic net sales increase of 34.8%. Our Balance segment organic net sales increased 1.4%, and brand profit and brand profit margin for the Balance segment both increased in the second quarter. Our transition to Non-GMO spreads is complete and Smart Balance Spreads are now entirely non-GMO across all

accounts. In addition, Earth Balance continues to have momentum in the spreads category and conventional retailers are looking to expand Earth Balance placements. Overall, I'm pleased with our progress. The combination of continued strong organic growth and a rebound in gross margins should result in a strong finish to 2014."

**2014 Second Quarter Results**

Total Company net sales in the second quarter of 2014 increased 18.7% to $131.3 million, compared to net sales of $110.7 million in the second quarter of 2013. This performance reflected strong growth from our Natural segment. Organic net sales (which include EVOL and exclude the licensing of Smart Balance Milk from our reported net sales) increased 19.4% in the second quarter of 2014 compared to the second quarter of 2013.

\*       \*       \*

**2014 Outlook**

The Company continues to expect net sales to be in the range of $540 to $550 million, adjusted EBITDA to be in the range of $89 to $91 million, and earnings per share to be in the range of $0.39 to $0.41. The earnings per share outlook is now based on diluted shares outstanding of 64.1 million. Additionally, as previously guided, gross margin is expected to improve sequentially to 41% by the fourth quarter due to operational improvements.

29.     On August 7, 2014, Boulder filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter.  The Company's Form 10-Q was signed by Defendants Hughes and Sacco, and reaffirmed the Company's statements previously announced that day.

30.     Also on August 7, 2014, Defendants hosted a conference call with investors and analysts discussing the Company's earnings results.  During the call, Defendant Hughes, in relevant part, stated:

Regarding our outlook. We are reaffirming our guidance for the year. We continue to expect net sales to be in the range of $540 million to $550 million, organic net sales growth in the 13% to 18% range, with the Natural segment expected to come in at the high end of the range of 25% to 30%, and Balance to be flat to slightly positive. Adjusted EBITDA to be in the range of $89 million to $91 million, EBITDA to be in the range of $79 million to $81 million, and EPS to be in the range of $0.39 to $0.41 per share, based on 64.1 million shares outstanding.

Regarding the quarterly flow of earnings for the back half. For the third quarter, we expect earnings per share to be in the range of $0.10 to $0.12 per share and the fourth quarter to be in the range of $0.18 to $0.20 per share.

In addition, we still expect gross margin to improve to 41% by year end from an average of 37% in the first half of 2014, or approximately a 400 basis point improvement. As we move from the first half to the second half of the year, we will begin to see the impact of our comprehensive margin improvement program.

Four key areas should contribute to the overall improvement in gross margins. First, the majority of the improvement will come from the reduction of inefficient trade and coupon spending, as we are gaining efficiencies with our retailers across our brands.

Second, effective in Q3, we will begin to feel the benefit of the price increase on Udi's Bakery we implemented to offset the higher egg white cost. Third, we reformulated our ingredient profile, which is now less dependent on egg whites. And finally, we have a number of operational initiatives, as we focus on continuous improvement projects that are already beginning to contribute to margin enhancement.

31.    The statements above were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was experiencing integration issues related to the acquisition of EVOL and Udi brands; (2) that the Company's Smart Balance product segment was under-performing; (3) that, as a result of this and other issues, the Company's gross margins would be lower than expected; and (4) that, as a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

32.    On October 22, 2014, Boulder issued a press release entitled, "Boulder Brands Announces Preliminary Third Quarter 2014 Results." Therein, the Company, in relevant part, stated:

Boulder Brands, Inc. (NasdaqGM: "BDBD") today provided an update on its anticipated financial results for the third quarter ended September 30, 2014, and its outlook for the fourth quarter of 2014.

- For the third quarter of 2014, the Company expects net sales to be approximately $133.9 million, an increase of 13% over the third quarter of 2013.
- Organic net sales increased approximately 8% and organic consumption growth increased approximately 12%.
- Adjusted EBITDA for the third quarter of 2014 is expected to be approximately $21 million.
- GAAP diluted loss per share for the third quarter of 2014 is expected to be approximately ($2.12) after giving effect to the impairment charges detailed below. Excluding certain items, non-GAAP diluted earnings per share for the third quarter of 2014 is expected to be approximately $0.08 compared to prior guidance of $0.10 to $0.12.
- For the fourth quarter of 2014, the Company expects net sales to be in the range of $132 to $137 million.
- Adjusted EBITDA for the fourth quarter of 2014 is expected to be in the range of $18 to $20 million.
- Non-GAAP diluted earnings per share for the fourth quarter of 2014 is expected to be in the range of $0.04 to $0.06 compared to prior guidance of $0.18 to $0.20.
- ***In addition, we are anticipating preliminary estimated non-cash goodwill and trade name impairment charges aggregating $147.5 million relating to the Smart Balance business, of which a significant portion will not be tax deductible.***

Chairman and Chief Executive Officer Stephen Hughes stated, "During the third quarter, we faced a number of headwinds that impacted our financial results. Smart Balance continued to face challenges in the spreads category, resulting in a larger than expected decline. ***In addition, as noted on our second quarter call, the mix shift of our fast-growing, lower margin Natural segment is significantly outpacing our higher margin Balance segment and is therefore putting increased pressure on our gross margins.***"

Mr. Hughes concluded, "While we are disappointed with our results, consumption is in line with our guidance and tracking ahead of sales, which is a positive indicator for the health of our business. We expect consumption in the fourth quarter to be in line with the third quarter, but are expecting lower shipments due to a normalizing of certain inventories at our largest customer. We look forward to detailing our strategy and outlook for the fourth quarter and 2015 on our upcoming earnings call."

(Emphasis added).

33.    On this news, shares of Boulder declined $3.11 per share, over 24%, to close on

October 22, 2014, at $9.62 per share, on unusually heavy volume.  Shares of Boulder further

declined $0.63 per share, approximately 6.5%, to close on October 23, 2014, at $8.99 per share,

reflecting a two-day decline of 29% on unusually heavy volume.

34.     On November 6, 2014, Boulder issued a press release entitled, "Boulder Brands

Announces 2014 Third Quarter Results."  Therein, the Company, in relevant part, stated:

> Boulder Brands, Inc. (NasdaqGM: "BDBD") today announced its financial results for the third quarter ended September 30, 2014.
>
> - For the third quarter of 2014, net sales were $133.9 million, an increase of 13.0% over the third quarter of 2013.
> - Organic net sales increased 8.4% and organic consumption growth increased 12.2%.
> - During the third quarter of 2014, net sales of Smart Balance continued to decline more than the category. Given the stronger trends and unique positioning with Earth Balance, the Company has made the strategic decision to substitute Earth Balance for under-performing Smart Balance items, and has lowered its long-term projections for Smart Balance. As a result, the Company recorded impairment charges to goodwill and the Smart Balance trade name of $150.5 million, of which $113.5 is not tax deductible.
> - The Company's operating loss was $138.1 million in the third quarter of 2014 after giving effect to the Smart Balance impairment charges. Adjusted EBITDA for the third quarter of 2014 was $20.9 million.
> - GAAP diluted loss per share for the third quarter of 2014 was $(2.17) after giving effect to the impairment charges noted above. Excluding certain items, non-GAAP diluted earnings per share for the third quarter of 2014 were $0.08.
> - As previously announced, for the fourth quarter of 2014,  net sales are expected to be in the range of $132 million to $137 million; adjusted EBITDA is expected to be in the range of $18 million to $20 million; and non-GAAP diluted earnings per share is expected to be in the range of $0.04 to $0.06 per share.
> - The initial outlook for the full year 2015 is as follows: Net sales are expected to be in the range of $575 million to $585 million; Gross margin is estimated to be in the 36% to 37% range; EBITDA is expected to be in the range of $67 million to $71 million; adjusted EBITDA is expected to be in the range of $78 million to $82 million; and diluted earnings per share is expected to be in the range of $0.25 to $0.29, based on 64 million shares outstanding.
>
> ***Chairman and Chief Executive Officer Stephen Hughes stated, "We faced a number of simultaneous headwinds this quarter, including the challenging spreads environment, the mix shift impact of our lower-margin but faster-***

*growing Natural segment, and continued commodity pressure in our gluten-free business, and we are disappointed with our recent performance. We are also realigning our inventory management practices with respect to our largest customer in order to be more consistent with the rest of our customer base, which will be a drag on our fourth quarter results.*" Mr. Hughes continued, "Rest assured, we have worked tirelessly to address our issues. While this quarter was not what we had planned for across the business, we are encouraged that consumption is tracking ahead of sales, which is a positive indicator, and based on continuing improvements in managing our cost structure, we remain confident in our long term margin outlook. After very thoughtful planning and our learnings from this quarter, we are providing 2015 guidance that we are eager and committed to achieve."

**2014 Third Quarter Results**

Total Company net sales in the third quarter of 2014 increased 13.0% to $133.9 million, compared to net sales of $118.5 million in the third quarter of 2013.  This performance reflected strong growth in our Natural segment.  Organic net sales, which include EVOL in the third quarter of 2013 in our reported net sales, increased 8.4% in the third quarter of 2014 compared to the third quarter of 2013.

\*       \*       \*

**2014 Outlook**

As recently announced, for the fourth quarter of 2014, the Company expects net sales to be in the range of $132 million to $137 million. Adjusted EBITDA for the fourth quarter of 2014 is expected to be in the range of $18 million to $20 million. Non-GAAP diluted earnings per share for the fourth quarter of 2014 is expected to be in the range of $0.04 to $0.06.

(Emphasis added).

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Boulder's

securities between December 23, 2013 and October 22, 2014, inclusive (the "Class Period") and

who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers

and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Boulder's securities were actively traded on the Nasdaq (the "NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Boulder shares were traded publicly during the Class Period on the NASDAQ.  As of February 24, 2015, Boulder had 61,268,908 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Boulder or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Boulder; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

40.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

41.      The market for Boulder's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Boulder's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Boulder's securities relying upon the integrity of the market price of the Company's securities and market information relating to Boulder, and have been damaged thereby.

42.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Boulder's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially

false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Boulder's business, operations, and prospects as alleged herein.

43.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Boulder's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

44.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45.     During the Class Period, Plaintiff and the Class purchased Boulder's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

46.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Boulder, his/her control over, and/or receipt and/or modification of Boulder's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Boulder, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

47.     The market for Boulder's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Boulder's securities traded at artificially inflated prices during the Class Period.  On April 2, 2014, the Company's stock closed at a Class Period high of $17.94 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Boulder's securities and market information relating to Boulder, and have been damaged thereby.

48.     During the Class Period, the artificial inflation of Boulder's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about Boulder's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Boulder and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49. At all relevant times, the market for Boulder's securities was an efficient market for the following reasons, among others:

(a) Boulder stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Boulder filed periodic public reports with the SEC and/or the NASDAQ;

(c) Boulder regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Boulder was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

50.     As a result of the foregoing, the market for Boulder's securities promptly digested current information regarding Boulder from all publicly available sources and reflected such information in Boulder's stock price. Under these circumstances, all purchasers of Boulder's securities during the Class Period suffered similar injury through their purchase of Boulder's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Boulder who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Boulder's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

54.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Boulder's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Boulder's financial well-being and prospects, as specified herein.

56.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Boulder's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Boulder and its business

operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

57.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

58.     The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Boulder's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations,

financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Boulder's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Boulder's securities during the Class Period at artificially high prices and were damaged thereby.

60.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Boulder was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Boulder securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

61.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

63. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64. The Individual Defendants acted as controlling persons of Boulder within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.     As set forth above, Boulder and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:     May 18, 2015

*s/Kip B. Shuman*
Kip B. Shuman
Rusty E. Glenn
**THE SHUMAN LAW FIRM**
885 Arapahoe Avenue
Boulder, CO 80302
Telephone:  (303) 861-3003

FAX:  (303) 484-4886
E-mail:  kip@shumanlawfirm.com
E-mail: rusty@shumanlawfirm.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

***Attorneys for Plaintiff Insider Asset Management, LLC***

GLANCY BINKOW & GOLDBERG LLP

**SWORN CERTIFICATION OF PLAINTIFF**
**BOULDER BRANDS, INC. SECURITIES LITIGATION**

I, _____Insider Asset Management, llc_____, certify that:

1.    I have reviewed the Complaint and authorized its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.    I did not purchase Boulder Brands, Inc., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in Boulder Brands, Inc. during the Class Period set forth in the Complaint are as follows:

Purchased 275 shares of BDBD on 6/6/14 for a total cost of $3,856.97.

Sold 275 shares of BDBD on 10/28/14 receiving proceeds of $2,328.19,

representing a loss of $1,528.78.

5.    I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated:   4/21/15

Jonathan Moreland
Portfolio Manager
Insider Asset Management, llc